UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                                                    Chapter 7

Von Ro Corporation,                                                          BKY 13-34910-GFK

      Debtor.

John R. Stoebner, Trustee,                                      ADV NO. _____

      Plaintiff                                         **COMPLAINT**
vs.

Joseph John Newton; Tracy L. Newton;
Donovan P. Hardy; Spire Credit Union
fka Greater Minnesota Credit Union;
Brian Smith, in his official capacity as
Sheriff of Kanabec County, Minnesota;
and John Doe 1-x, Jane Doe 1-x, ABC corporation,

      Defendants

For his Complaint against Defendants Joseph John Newton, Tracy L. Newton, Donovan

P. Hardy, Spire Credit Union fka Greater Minnesota Credit Union, Brian Smith in his official

capacity as Sheriff of Kanabec County, Minnesota, and John Doe 1-x, Jane Doe 1-x, and ABC

corporation, Plaintiff states and alleges as follows:

**PARTIES**

1.      Von Ro Corporation (**"Von Ro"** or **"Debtor"**) is a Minnesota corporation with its

former principal place of business at 536 Clark Street, Mora, MN  55051.

2.      Von Ro filed a voluntary petition under Chapter 7 of Title 11 (the **"Bankruptcy**

**Code"** or **"Code"**) on October 11, 2013 (the **"Petition Date"**).

3.      On April 8, 2015, John R. Stoebner ("**Plaintiff" or "Trustee"**) was appointed as Chapter 7 bankruptcy trustee for the estate of the Debtor as successor trustee to Stephen J. Creasey ("**Creasey"**).

4.      Defendant Joseph John Newton ("**Joseph"**) is a resident of Minnesota residing at 13992 Wellington Drive, Eden Prairie, MN  55347.

5.      Defendant Tracy L. Newton ("**Tracy"**) is a resident of Minnesota residing at 13992 Wellington Drive, Eden Prairie, MN  55347.  Upon information and belief, Defendants Joseph and Tracy are husband and wife.

6.      Defendant Donovan P. Hardy ("**Hardy"**) is a resident of Minnesota residing at 708 Jewell Street, Mora, MN  55051.  Hardy is the president and sole shareholder of the Debtor.

7.      Defendant Spire Credit Union fka Greater Minnesota Credit Union ("**GMCU"**) is on information and belief a federally chartered credit union with its principal place of business at 112 South Lake Street, Mora, MN  55051.

8.      Defendant Brian Smith ("**Smith"**) is the Sheriff of Kanabec County, Minnesota with an address of 18 North Vine St., Mora, MN  55051.

9.      Defendants John Doe 1-x, Jane Doe 1-x, and ABC corporation are Defendants whose identity is presently unknown to Plaintiff but who may claim some interest in the property sought to be recovered pursuant to this litigation or who may have received unauthorized post-petition transfers of property of the estate.  Should these Defendants be subsequently identified, Plaintiff will amend his complaint.

10.     Non-party Stearns Bank National Association ("**Stearns Bank"**) is a national banking association with its headquarters at 4191 Second Street South, Saint Cloud, Minnesota 56303.  Prior to the commencement of this litigation, the Trustee settled with Stearns Bank.

2

## JURISDICTION, JUDICIAL AUTHORITY AND VENUE

11.     This is an adversary proceeding under Rule 7001 of the Federal Rules of Bankruptcy Procedure that relates to the bankruptcy case of Debtor.  The bankruptcy case is pending in this District.

12.     This Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a), (b) and (e), 28 U.S.C. § 157(a), Bankruptcy Rule 7001(1) and Local Rule 1070-1.

13.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (F), (H), (K) and (O).

14.     To the extent that any of the claims herein are non-core or the Bankruptcy Court determines that it lacks the judicial authority to enter final orders in any matters identified as core in 11 U.S.C. § 157, Trustee consents to final orders being entered by the bankruptcy court.

15.     Venue is proper in this District under 28 U.S.C. § 1409(a).

## FACTS

16.     Debtor is a Minnesota corporation organized April 4, 1983.  The Debtor was originally owned and operated by Roger and Yvonne Hardy, Hardy's parents.  As of December 26, 2007, Yvonne Hardy was the president and secretary and Roger was a manager.

17.     Yvonne died on August 4, 2010 and thereafter Hardy became the president and secretary and Roger Hardy became the CEO and CFO.

18.     Roger died in 2011 and thereafter, Hardy became the sole owner and officer of the Debtor.

19.     At all relevant time prior to the Petition Date, Debtor owned and operated a recreational vehicle sales business from a location owned by the Debtor in Mora, Minnesota.

20.    The Debtor sold and offered for sale new and used recreational vehicles of a variety of configurations and new and used "park model" mobile homes.

21.    In order to engage in its business, the Debtor was required to hold a Minnesota Motor Vehicle Dealer License issued by the Minnesota Department of Public Safety (**"DPS"**).

22.    At all relevant times prior to the Petition Date, the Debtor held a Motor Vehicle Dealer License.

23.    As a holder of a Motor Vehicle Dealer License, the Debtor was subject to regulation by the State of Minnesota and the DPS.

### THE GMCU LOANS

24.    GMCU provided financing to the Debtor in March 2007 and again in December 2007 (the **"GMCU Loans"**).

25.    Prior to the GMCU Loans, the Debtor had financed its operations through Kanabec State Bank (**"KSB"**).

26.    Upon information and belief, the Debtor had granted a security interest to KSB and KSB filed a UCC-1 financing statement with the Minnesota Secretary of State on September 14, 1998 (the **"KSB UCC-1"**).  A copy of the KSB UCC-1 is attached hereto as Exhibit 1.

27.    The KSB UCC-1 indicated that it covered: (i) inventory; (ii) equipment; (iii) accounts, instruments, documents, chattel paper, and other rights to payment; (iv) general intangibles; and (v) proceeds and products of the foregoing.

28.    The KSB UCC-1 was not signed by the Debtor and therefore was ineffective as a financing statement because financing statements under Minnesota's enactment of the Uniform Commercial Code (**"UCC"**) as it existed in 1998 were required to be signed by the debtor.  *See,*

Minn. Stat. § 336.9-402 (1998).   As of September 14, 1998, therefore, KSB's claimed security interests were unperfected and ineffective.

29.    Had the KSB UCC-1 been signed, filed and effective, it would have lapsed under the former law five years after the filing date – September 14, 2003.

30.    The Minnesota Legislature amended the UCC in 2000 and the amendments became effective on July 1, 2001.  *See generally,* Laws 2000, Ch. 399.

31.    Part of the transition rules enacted with the 2000 amendments provided that security interests that were ineffective under the former law could automatically become effectively perfected under the new law.  Minn. Stat. § 336.9-704.

32.    Minn. Stat. § 336.9-705(d) provides as a general rule:

The filing of a continuation statement after Laws 2000, chapter 399, takes effect does not continue the effectiveness of the financing statement filed before Laws 2000, chapter 399, takes effect.

33.    Minn. Stat. § 336.9-705(d) contains an exception to the general rule:

However, upon the timely filing of a continuation statement after Laws 2000, chapter 399, takes effect and in accordance with the law of the jurisdiction governing perfection as provided in Part 3, the effectiveness of a financing statement filed in the same office in that jurisdiction before Laws 2000, chapter 399, takes effect continues for the period provided by the law of that jurisdiction.

34.    KSB filed the KSB UCC-1 in the office of the Minnesota Secretary of State before Laws 200, chapter 399 took effect.  To continue the effectiveness of the KSB UCC-1, KSB was required to file a continuation statement with the Minnesota Secretary of State on or before September 23, 2003.

35.    Neither KSB nor anyone else filed a continuation statement for the KSB UCC-1 with the Minnesota Secretary of State by September 23, 2003 and as a result, the KSB UCC-1 lapsed on September 23, 2003.

36.     On June 26, 2003, KSB filed a UCC Financing Statement identified as "in lieu of" (the **"In Lieu Statement"**).  A copy of the In Lieu Statement is attached hereto as <u>Exhibit 2</u>.

37.     The In Lieu Statement references the KSB UCC-1 but does not include a description of the collateral required for an effective initial financing statement.  *See* Minn. Stat. §336.9-502(a).

38.     Because the KSB UCC-1 was correctly filed with the Minnesota Secretary of State under the former law, the filing of the In Lieu Statement did not operate to continue the KSB UCC-1.  Rather, to continue the KSB UCC-1, a continuation statement was necessary. *See*, Minn. Stat. § 336.9-705(d) and no continuation statement was filed before September 23, 2003.

39.     On or about May 26, 2005, the Debtor paid in full the part of its debt to KSB that was secured by personal property using funds obtained by a new loan made by GMCU.

40.     On May 26, 2005, KSB filed a UCC Financing Statement Amendment purporting to assign the KSB UCC-1 to GMCU (the **"KSB Assignment"**).  A copy of the KSB Assignment is attached hereto as <u>Exhibit 3</u>.

41.     The KSB Assignment was ineffective to assign anything to GMCU because:  (i) the KSB UCC-1 had lapsed without continuation on September 23, 2003; and (ii) no debt was assigned by KSB to GMCU along with the KSB Assignment.

42.     To secure the GMCU Loans, the Debtor granted GMCU security interests in certain assets of the Debtor, including inventory and equipment.

43.     GMCU never filed any initial UCC financing statements with the Minnesota Secretary of State to perfect its security interests.  Rather on June 11, 2008, GMCU filed a continuation statement with the Minnesota Secretary of State and another continuation

statement on May 8, 2013.  Both of these purport to "continue" the In Lieu Statement filed on May 26, 2005.  Copies of these two continuation statements are attached hereto as <u>Exhibit 3A</u>.

44.     The In Lieu Statement was insufficient to constitute an initial financing statement.

45.     Neither continuation statement revived the initial KSB UCC-1 which lapsed as a matter of law on July 2, 2002.

46.     The security interests granted to GMCU were not properly perfected on the Petition Date.

47.     Subsequent to March 2007, GMCU made additional loans to the Debtor secured by specific vehicles.  Upon information and belief, for some of these specific vehicles, GMCU was identified on the certificates of title as the secured party.

48.     As early as October 2011, the Debtor was having difficulty maintaining the required payments to GMCU.

49.     On December 16, 2011, Hardy admitted to GMCU that Von Ro did not have the funds to continue the payments and that Von Ro had spent the proceeds of two sold vehicles without paying GMCU the proceeds as required by their agreements.

50.     On February 6, 2012, GMCU issued a default letter claiming that the Debtor was in default for failing to pay GMCU the proceeds of a loan secured by a 2012 Fairmont Homes park model.

51.     On May 10, 2013, GMCU issued a Notice of Default claiming that the Debtor was in default in the amount of $772,598.37 on Loan No. 10671-01 and $2,690.76 on Loan No. 10671-04 and demanded that $775,289.13 be paid within 10 days.  The Debtor failed to pay the funds demanded.

52.     On or about June 11, 2013, the Debtor, Hardy and GMCU entered into a Forbearance, Confession of Judgment and Loan Modification Agreement (the "**Forbearance Agreement**").

53.     On or about August 30, 2013, the Debtor advised GMCU that the Debtor was unable to continue to perform under the terms of the Forbearance Agreement and made a proposal to modify the terms of the Forbearance Agreement.  GMCU rejected the proposal.

54.     On September 4, 2013, GMCU issued a Notice of Default and required payment of $728,381.78 within 10 days.  The Debtor failed to pay the funds demanded.

55.     On September 17, 2013, GMCU filed the confession of judgment the Debtor had executed at the time of the Forbearance Agreement in Kanabec County, Minnesota.

56.     On September 18, 2013, the court issued a writ of execution to the sheriff of Kanabec County and the same day Smith went to the Debtor's location in Mora, Minnesota to levy on the Debtor's vehicles accompanied by a representative of GMCU.  Some vehicles were seized and removed from the Debtor's premises by Smith and stored.

57.     The vehicles removed by Smith have not been sold, nor has any creditor claiming a security interest in such vehicles sought to foreclose on that security interest.

58.     The seized vehicles remain in the possession of Smith pursuant to a storage agreement with GMCU.

59.     Among the vehicles removed and stored by Smith were the following:

> 1985 Komfort 5th Wheel VIN 1K73KFN26F1002460 (the **"Komfort"**)
> 2013 Enterra Cruiser RV VIN4RXTE3128D2200339 (the **"Enterra"**)
> 2004 Dutchman Classic VIN47CTD4T284G51456 (the **"Dutchman"**)
> 2013 Woodland Park Model AP100L VIN 1W9BP03SPD2046733 (the **"AP100L"**)

60.     Upon information and belief, Smith also levied on a 2350 International Bucket Tractor and a Car Hauler Trailer (the **"Levied Equipment"**) which were equipment used in the Debtor's business, not inventory held for resale.

61.     Effective May 5, 2014, Creasey abandoned the estate's interest in the Levied Equipment.

62.     On the Petition Date, Creasey abandoned the estate's interest in the AP100L but reserved all fraudulent transfer and other claims against Joseph.

63.     As of the date hereof, Smith remains in possession of the Komfort, the Enterra, and the Dutchman (collectively the **"Three Remaining Vehicles"**).

64.     The Debtor executed the signature declaration for its bankruptcy filing on September 27, 2013.  The voluntary Chapter 7 petition was filed on October 11, 2013.

### FACTS REGARDING JOSEPH AND TRACY

65.     On or about November 30, 2013, Plaintiff received an email from Joseph in which he claimed to own the AP100L and the Enterra (the **"November 30 Email"**).  A copy of the November 30 Email is attached hereto as Exhibit 4.

66.     In the November 30 Email, Joseph admitted in writing that prior to the birth of his second child in April 2013, he would could not afford the cost of day care for the new baby and his existing daughter.

67.     In the November 30 Email, Joseph advised Plaintiff that Hardy told Joseph that Hardy could "help me out" if Joseph bought some RVs through Von Ro.

68.     Upon information and belief, at about the time that Hardy offered to help Joseph out, Von Ro had already ordered the AP100L from the manufacturer, Woodland Park, Inc., on

or about December 13, 2012. The price of the AP100L as ordered was $44,096.40. The delivery date was set at February 11, 2013. The terms were COD.

69.     Upon information and belief, at the time Von Ro ordered the AP100L, it had no ability to pay the purchase price upon delivery.

70.     Upon information and belief, at the time that Hardy offered to help Joseph out, neither Joseph nor his wife Tracy were in the market to buy a park model or a recreational vehicle of any kind; rather, they were looking to make some quick money by participating in a scheme by Hardy designed to defraud GMCU, Von Ro's inventory financer, and possibly other lenders.

71.     Upon information and belief, the way that Hardy was going to help Joseph out was for Joseph to "buy" vehicles from Von Ro or Hardy at cost or near cost using financing obtained by Joseph. The vehicles would then be immediately "consigned" to Von Ro by Joseph for resale and when sold, Joseph and Von Ro would split the profits. Von Ro would advance Joseph's share of the profits up front to "help Joseph out."

72.     Carrying costs for Joseph's financing would be paid by Von Ro pending the resale.

73.     Upon information and belief, Hardy's intent was to obtain inventory for resale without alerting GMCU to the existence of additional inventory to which its security interests would attach by making it appear that the consigned vehicles belonged to others.

74.     In furtherance of this scheme, Hardy, Joseph, and Tracy jointly applied to Stearns Bank to borrow $43,800 on or about January 23, 2013.

75.     As of January 23, 2013, Von Ro had also ordered, but had not yet received, a new Woodland Park Model AP105L (VIN 1W9BP03S3D2046713) (the **"AP105L"**).

10

76.     Although a credit report obtained by Stearns Bank indicated that both Kanabec State Bank and GMCU were reporting delinquencies in Von Ro obligations, upon information and belief, Hardy falsely represented to Stearns Bank on or about January 23, 2013, that the delinquent payments had been brought current.

77.     Hardy further falsely represented to Stearns Bank that the collateral for this loan was to be the AP105L with a value of $62,500.00 which was owned personally by Hardy.

78.     Upon information and belief, Hardy never paid Von Ro anything for the AP105L.

79.     Upon information and belief, Von Ro never entered into a purchase agreement with Hardy for the AP105L.

80.     Upon information and belief, neither Hardy nor Von Ro ever completed or submitted an application to register or transfer title to the AP105L with the DPS from Von Ro to Hardy.

81.     At all relevant times, Hardy, Joseph and Tracy were not licensed vehicle dealers in Minnesota.

82.     Simultaneously with Hardy's application for the $43,800 loan, Joseph and Tracy represented to Stearns Bank that they had agreed to purchase the AP105L from Hardy for $53,800.00 and had paid [Hardy] a down payment of $10,000.  Upon information and belief, the representation that Joseph and Tracy had paid a $10,000 down payment was false.  In fact, Joseph and Tracy paid nothing to Von Ro as a down payment.

83.     Joseph and Tracy further falsely represented to Stearns Bank that they planned to take possession of the AP105L in the summer.  In fact, Joseph and Tracy had no intention of ever taking possession of the AP105L.

84.    Joseph, Tracy and Hardy also falsely represented to Stearns Bank that Hardy had "take out financing" pre-arranged and only needed "temporary financing" until the AP105L take out financing was put in place.

85.    In reliance on the representations of Hardy, Joseph and Tracy, several of which were materially false, on January 23, 2013, Stearns Bank approved a loan to Hardy, Joseph and Tracy in the amount of $43,855.00, including $55.00 of prepaid finance charges, from Stearns Bank (**"Loan No. 68055"**).

86.    To evidence Loan No. 68055, on January 25, 2013, Hardy, Joseph and Tracy made executed and delivered a Promissory Note in the original principal amount of $43,855.00 to Stearns Bank (**"Note No. 68055"**).  Note No. 68055 had a six month term and was due and payable in full on July 25, 2013.  A copy of Note No. 68055 is attached hereto as Exhibit 5.

87.    Note 68055 identifies the "Borrower" as Hardy, Joseph and Tracy using Von Ro's address of 536 Clark Street, Mora, MN  55051.

88.    Although Von Ro is not identified as a "Borrower" on Note 68055, the note contains an acknowledgement that the note is secured by a "Security Agreement dated January 25, 2013 executed by Von Ro Corporation in favor of lender."

89.    A copy of the security agreement referenced in Note 68055 is attached hereto as Exhibit 6 (the **"January 25 Security Agreement"**).

90.    In the January 28 Security Agreement, although Von Ro was not a maker on Note 68055, Von Ro purported to grant to Stearns Bank a security interest in the AP105L as collateral for Loan No. 68055.  No UCC financing statement was filed identifying the AP105L as collateral for Loan 68055 and no application to have Stearns Bank identified as a secured party on the Certificate of Title for the AP105L was ever filed with the DPS.

91.   On January 28, 2013, upon the direction of Hardy, Joseph and Tracy, Stearns Bank issued a cashier's check payable to Von Ro Corporation in the amount of $43,800, being the net proceeds of Loan No. 68055.  The check was deposited into Von Ro's account on February 7, 2013.  A copy of the cashier's check and the deposit information is attached hereto as Exhibit 7.

92.   On or about February 15, 2013, Hardy executed a purchase agreement on behalf of Von Ro with Joseph for the AP100L (the **"AP100L Purchase Agreement"**).  A copy of the AP100L Purchase Agreement is attached hereto as Exhibit 8.

93.   The AP100L Purchase Agreement was handwritten and signed by Hardy and Joseph.  It purportedly established a total price for the AP100L as follows:

| | |
|---|---|
| Base Price: | $49,823.00 |
| Sales tax: | $ 2,226.59 |
| Doc Fee: | $    50.00 |
| Lic & Title: | $    60.00 |
| Total Price: | $52,159.59 |

94.   By handwritten notation in the margin of the AP100L Purchase Agreement, Hardy acknowledged that Joseph had given Von Ro an $8,000 down payment via check no. 1060.

95.   The acknowledgement of the $8,000 down payment by Hardy in the AP100L Purchase Agreement was false.  Upon information and belief, no check was ever delivered by Joseph or, if it was delivered, was never negotiated by Von Ro.  Joseph therefore paid no down payment on the purported purchase of the AP100L.

96.   Simultaneously with the AP100L Purchase Agreement, also on February 15, 2013, Joseph signed a handwritten consignment agreement purporting to consign the AP100L to Von Ro for the period February 15, 2013 through May 15, 2013 (the **"Consignment**

**Agreement"**) whereby Joseph purported to consign the AP100L to the Debtor at a consignment price of $53,000.  A copy of the Consignment Agreement is attached hereto as <u>Exhibit 9</u>.

97.    The Consignment Agreement does not contain the content required by DPS Rule 7400.530 because:

(a) The Consignment Agreement does not contain the full name, address and phone number of each owner of the AP100L;

(b) The Consignment Agreement does not contain the full name, address, phone number, and dealer number of each dealer involved in the agreement;

(c) The Consignment Agreement does not contain the terms of the agreement, including the method of calculating the dealer's compensation;

(d) The Consignment Agreement did not contain a statement specifying which party was responsible for maintaining insurance on the AP100L in accordance with Minn. Stat. Ch. 65B, during the time the dealer was holding the vehicle for sale; and

(e) The Consignment Agreement did not contain the policy number and the name of the insurance company providing insurance on the AP100L

98.    Hardy submitted Joseph's application for financing of the AP100L to Source One Financial, Inc. (**"Source One"**), a recreational vehicle financing broker.

99.    Source One was able to obtain financing for Joseph and Tracy for the AP100L in the amount of $44,159.59 (the **"BMO Loan"**) from BMO Harris Bank NA (**"BMO"**).

100.    BMO made the BMO Loan on February 15, 2013, based in part on the false representation of Joseph and Hardy that Joseph had paid Von Ro an $8,000 down payment when in fact he had paid no down payment.

101.   The proceeds of the BMO Loan, $44,159.59, were paid to Source One on or about February 15, 2013.

102.   Von Ro partially completed an Application to Title/Register a Vehicle (the **"Incomplete Title Application"**), a form required by the DPS.   The Incomplete Title Application was dated February 15, 2015.   A copy of the Incomplete Title Application is attached hereto as Exhibit 10.   The Incomplete Title Application indicated that BMO was to be the first lien holder on the AP100L.

103.   On February 22, 2013, Source One transmitted to Vo Ro's account at Kanabec State Bank via an ACH electronic transfer, the amount of $46,367.57 comprised of the $44,159.59 in proceeds from the BMO Loan plus $2,207.98 in reserves owed by Source One to Von Ro.

104.   On February 25, 2013, Von Ro entered into a purchase agreement with a Troy Skogan to sell Mr. Skogan the AP105L for $34,932.   Mr. Skogan paid the purchase price by check to Von Ro on March 4, 2013.   Title to the AP105L was issued to Troy Skogan by the DPS on August 7, 2013.

105.   The first monthly payment to BMO on the BMO Loan in the amount of $366.71 was due on March 15, 2013.   A copy of a Loan/Line Transaction History of the BMO financing produced to Plaintiff by Joseph is attached hereto as Exhibit 11.

106.   The Debtor did not provide a written, or any, guarantee of Joseph's debt to BMO.

107.   On February 19, 2013, the Debtor issued check no. 32594 in the amount of $44,158.40 to Woodland Park, Inc. (**"Check No. 32594"**).   A copy of Check No. 32594 is attached hereto as Exhibit 12.   Woodland Park, Inc. was the manufacturer of the AP100L and Check No. 32594 was issued in full payment of the purchase price of the AP100L.

15

108.   Upon information and belief, in March of 2013, an Illinois resident, one John Enright (**"Enright"**), entered into a purchase agreement with the Debtor to purchase a 2013 Woodland Park vehicle and in partial payment therefore, traded in the Enterra which was titled in Illinois (the **"Enright Purchase Agreement"**).  A copy of the Enright Purchase Agreement redacted to remove personal information is attached hereto as <u>Exhibit 13</u>.

109.   The Enright Purchase Agreement indicates that the Debtor allowed Enright $29,000 for the trade-in of the Enterra.

110.   At or about the time he signed the Enright Purchase Agreement, Enright and his wife also executed the original of Illinois Certificate of Title of a Vehicle for the Enterra (the **"Enterra Title"**) as "sellers" and delivered the original of the certificate to Von Ro with the intent to transfer title to the Enterra to the Debtor.  A copy of the Enterra Title is attached as <u>Exhibit 14</u>.

111.   Upon information and belief, Hardy instructed the Enrights not to date the Enterra Title or to fill in the Debtor's name as buyer.

112.   The Enterra Title identified Citizens Bank in Flint, Michigan as the existing first lien holder on the Enterra.  Thereafter, the Enterra was held for sale by Von Ro.

113.   On April 1, 2013, the Debtor issued three checks to Joseph as follows:

| | |
|---|---|
| Check No. 32601 | $5,000.00 |
| Check No. 32602 | $1,466.84 |
| Check No. 32603 | <u>$  199.00</u> |
| Total: | $6,665.84 |

114.   Copies of Check No. 32601, 32602 and 32603 are attached hereto as <u>Exhibit 15</u>.

115.   There is no written agreement creating any obligation owing by the Debtor to Joseph which were paid by these three checks.

116.   Upon information and belief, Check No. 32601 for $5,000 was paid as an advance to Joseph from the Debtor on the profit the Debtor agreed to pay to Joseph if and when the AP100L was sold by the Debtor.  The AP100L was never sold and the Debtor's obligation to pay over the profit therefore never arose.

117.   Upon information and belief, Check No. 32602 for $1,466.84 was issued by the Debtor to reimburse Joseph for the first four monthly payments owed to BMO ($366.71 x 4 = $1,466.84) which the Debtor had no legal obligation to pay.

118.   Upon information and belief, Check No. 32603 for $199.00 was issued by the Debtor to reimburse Joseph for some expense associated with Joseph's purported ownership of the AP100L, an expense which the Debtor had no legal obligation to pay.

119.   Because the AP105L, the collateral for Loan 68055, had been sold by Von Ro, on March 15, 2013 Von Ro granted a security interest to Stearns Bank in a 2002 Breckenridge LE 1238FDR (VIN 5DJTB0U2725007044) owned by Von Ro (the **"2002 Breck"**) as substitute collateral for Loan No. 68055.

120.   No UCC financing statement was filed identifying the 2002 Breck as collateral for Loan 68055 and no application to have Stearns Bank identified as a secured party on the Certificate of Title for the 2002 Breck was ever filed with the DPS.

121.   On June 10, 2013, Von Ro issued check no. 32771 to Citizens Bank in the amount of $23,029.12.  The check indicates that it is a "dealer payoff for customer John & Ellen Enright."  A copy of the check is attached as Exhibit 16.

122.   According to the Enterra Title, FirstMerit Bank, N.A. released the lien as successor in interest to Citizens Bank on June 28, 2013.

123.   On July 5, 2013, the Debtor issued Check No. 32860 to Joseph in the amount of $366.71.   Upon information and belief, Check No. 32861 was issued to Joseph to reimburse Joseph for a monthly payment Joseph made to BMO which the Debtor had no legal obligation to pay.  A copy of Check No. 32860 is attached hereto as <u>Exhibit 17</u>.

124.   On or about July 16, 2013, Joseph and Tracy applied to Stearns Bank for $37,416.95 ostensibly to finance the purchase of the Enterra.   According to bank documents, Joseph and Tracy planned to consign the Enterra to Von Ro to sell on its lot and to split the profit, estimated at $10,000, with Hardy.

125.   On July 25, 2013, Loan No. 68055 became due and was not paid at maturity.

126.   The 2002 Breck was sold by Von Ro on July 29, 2013 again leaving Stearns Bank with no collateral for Loan No. 68055.

127.   On or about August 20, 2013, the Debtor entered into a purchase agreement with Joseph and Tracy for the Enterra.  A copy of the Enterra purchase agreement is attached hereto as <u>Exhibit 18</u>.  It established a purchase price for the Enterra as follows:

| | |
|---|---|
| Base Price: | $49,823.00 |
| Sales tax: | $ 2,226.59 |
| Doc Fee: | $    50.00 |
| Lic & Title: | $    60.00 |
| Total Price: | $52,159.59 |

128.   Neither Joseph nor Tracy ever paid anything to Von Ro for the purchase of the Enterra.

129.   Neither the Debtor, Hardy, Joseph, Tracy nor Stearns Bank have ever filed an application to title or register the Enterra or any security interest therein with the DPS.

130.   Upon information and belief, Joseph and Tracy have never had possession of the Enterra.  Rather, at all times it remained on the sales lot of the Debtor where it was held out to

the public as being for sale.  Upon information and belief, the Debtor did not indicate to the public in any way that the vehicle was being held for sale on consignment.

131.  On August 21, 2013, Hardy, Joseph and Tracy executed a promissory note to Stearns Bank in the amount of $37,456.00 ("Note No. 68757").  The proceeds of Note No. 68757 were not used to fund the purchase of the Enterra as bank documents indicate was the original intended purpose.  But because Note No 68055 had not been paid at maturity, the proceeds of Note No. 68757 instead were used to partially retire Note No. 68055 which was by then past due.  The balance of $8,000 was paid to Stearns Bank by Von Ro by check on August 23, 2013 to fully retire Note No. 68055.

132.  On September 7, 2013, the Debtor issued Check No. 3112 to Joseph in the amount of $366.71.  Upon information and belief, Check No. 3112 was issued to Joseph to reimburse Joseph for a monthly payment Joseph made to BMO which the Debtor had no legal obligation to pay.  A copy of Check No. 3112 is attached hereto as Exhibit 19.

133.  On September 27, 2013, Hardy signed the signature declaration and other documents needed to accomplish the filing of the Chapter 7 bankruptcy for Von Ro.

134.  Subsequently, the Incomplete Title Application was completed in handwriting and signed by Hardy on behalf of Von Ro.  It was also signed by Joseph.  The completed application was submitted to the DPS on September 30, 2013, three days after Hardy had signed the bankruptcy papers for Von Ro.  A copy of the completed application signed by Joseph and submitted to the DPS is attached hereto as Exhibit 20.

135.  Upon filing of the completed application, on September 30, 2013, the DPS issued Certificate of Title E273A0130 for the AP100L.  A copy of Certificate of Title No. E273A0130

is attached as Exhibit 21 (the **"AP100L COT"**).  The transfer of title to the AP100L to Joseph

is hereinafter referred to as the **"AP100L Title Transfer."**

136.    BMO was shown as the first lien holder on the AP100L COT.

137.    The Trustee has determined that the lien held by BMO in the AP100L cannot be

avoided and has filed a notice of abandonment of the AP100L but has preserved the estate's

claims as to Joseph.

138.    In April, 2015, Plaintiff reached a settlement, subject to court approval, with

Stearns Bank (the **"Stearns Bank Settlement"**).  A notice of settlement was filed on April 29,

2015.  The Stearns Bank Settlement was approved by court order entered on June 23, 2015.

**COUNT I**
**(AGAINST ALL DEFENDANTS)**
**DETERMINATION OF THE VALIDITY, PRIORITY**
**OR EXTENT OF LIEN OR OTHER INTEREST IN PROPERTY**

139.    Plaintiff restates the allegations in the preceding paragraphs.

140.    Stearns Bank has confirmed in writing that it claims no security interest in any

property of Von Ro that was perfected as of the Petition Date.  Any security interests granted by

the Debtor to Stearns Bank therefore may be avoided and preserved for the benefit of the estate

as hereinafter provided.

141.    In the Stearns Bank Settlement, Stearns Bank has agreed to stipulate to the entry

of judgment on the claims against it in this Count I.

142.    Smith is in possession of the Three Remaining Vehicles as a result of his levy but

otherwise has no legal or equitable interest in the Three Remaining Vehicles.

143.    GMCU claims a security interest in all of the Debtor's pre-petition assets but none

of the security interests claimed by GMCU were properly perfected as of the Petition Date.

Any security interests granted by the Debtor to GMCU therefore may be avoided and preserved for the benefit of the estate as hereinafter provided.

144.   The purported purchase of the AP100L by Joseph was in reality a disguised financing arrangement.  The issuance of a title certificate showing Joseph as the owner of the AP100L was a preference, a fraudulent transfer, or both, and may be avoided and preserved for the benefit of the estate as hereinafter provided.

145.   Although Joseph and Tracy entered into a purchase agreement with Von Ro for the RV, neither Joseph nor Tracy paid anything for the RV, the anticipated transaction never closed and the title to the Enterra was never transferred.  Joseph and Tracy have no legal or equitable interest in the RV.

146.   The Enterra Title attached hereto as <u>Exhibit 14</u>, shows no evidence of a transfer or sale by Von Ro to Hardy, Joseph or Tracy.

147.   No application to title or register the Enterra has ever been filed with the DPS.

148.   The DPS Notification was never filed with the DPS.

149.   By this Count I, Plaintiff seeks a determination (a) that the Three Remaining Vehicles were on the Petition Date, or will become upon avoidance of claimed liens and interests, property of the estate free and clear of all liens and interests; and (b) that Stearns Bank and GMCU had no validly perfected security interests in any property of the Debtor on the Petition Date and that any security interest granted to Stearns Bank or GMCU may be avoided as hereinafter provided.

## COUNT II

## (AGAINST DEFENDANTS HARDY, JOSEPH, TRACY AND GMCU)
## AVOIDANCE OF TRANSFERS OF INTEREST IN
## PROPERTY OF THE ESTATE
## 11 U.S.C. § 544(a)

150.   Plaintiff restates the allegations in the preceding paragraphs.

151.   Because Stearns Bank failed to perfect its security interests in the AP100L and the RV, Plaintiff may avoid the grant of these security interests and preserve them for the benefit of the estate.

152.   Because GMCU failed to perfect its security interests in the Debtor's inventory, equipment and other property, Plaintiff may avoid the grant of these security interests and preserve them for the benefit of the estate.

153.   As a hypothetical judgment lien creditor and a hypothetical creditor with an execution returned unsatisfied as of the Petition Date, Plaintiff may avoid any purported transfers of security interests to Stearns Bank and security interests to GMCU.

154.   In the Stearns Bank Settlement, Stearns Bank has agreed to stipulate to the entry of judgment on the claims against it in this Count II.

155.   By this Count II, Plaintiff seeks judgment against Hardy, Joseph, Tracy and GMCU avoiding the grants of all security interests by the Debtor to GMCU and preserving such security interests for the benefit of the estate.

## COUNT III
## (AGAINST DEFENDANT JOSEPH)
## AVOIDANCE OF PREFERENCE
## 11 U.S.C. § 547

156.   Plaintiff restates the allegations in the preceding paragraphs.

157.   The purported purchase of the AP100L by Joseph and the simultaneous purported consignment of the AP100L back to Von Ro (the **"AP100L Transaction"**) was intended to be and was in fact a disguised unsecured loan transaction with Joseph borrowing $44,159.59 from BMO on February 15, 2013 and loaning the loan proceeds to Von Ro.

158.   Neither the application to register title to the AP100L nor the registration of the lien position of BMO was filed with the DPS within the time periods provided by law.   Upon information and belief, the reason Von Ro failed to complete the required registration was to avoid paying the required sales tax of $2,226.59 and the transfer fees and because the transaction was really a loan, not a sale.

159.   Joseph is an insider of the Debtor for purposes of 11 U.S.C. § 547(b)(4)(B) because the AP100L Transaction was not an arms-length transaction.   Upon information and belief, Joseph did not request any financial information from Von Ro and made no investigation of Von Ro's financial condition, ability to repay the loan or its ability to resell the AP100L on consignment.

160.   After Hardy had signed the bankruptcy papers for Von Ro on September 27, 2013, he recognized that Joseph would be left without a source of repayment for the loan he had made to Von Ro – the loan he still owed to BMO.

161.   The title registration papers for the AP100L were hand carried to the DPS and filed on an expedited basis.   The new title certificate was issued the same day showing Joseph as the owner and BMO as lien holder.

162.   The AP100L Title Transfer was made in payment of the unsecured loan that Joseph had made to Von Ro.

163.   The AP100L Title Transfer was made to a creditor on account of antecedent debt owed to Joseph by the Debtor.

164.   The AP100L Title Transfer was made at a time when the Debtor was insolvent.

165.   The AP100L Title Transfer enabled Joseph to receive more that he would have received if (a) the case was a case under chapter 7 of the Bankruptcy Code; (b) the title to the AP100L had not been transferred; and (c) Joseph received payment of such debt to the extent provided by the provisions of Title 11 of the United States Code.

166.   By this Count III, Plaintiff seeks judgment against Joseph: (a) avoiding the transfer of title to the AP100L to Joseph as a preference; (b) preserving the avoided transfer for the benefit of the estate under Bankruptcy Code §551; and (c) awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for the value of the AP100L, which according to the purported purchase agreement was $52,049.59.

**COUNT IV**
**(AGAINST DEFENDANT JOSEPH)**
**AVOIDANCE OF PREFERENCE**
**11 U.S.C. § 547**

167.   Plaintiff restates the allegations in the preceding paragraphs.

168.   Within one year of the Petition Date, the Debtor issued the following checks to Joseph (the "**AP100L Payments**"):

| | | |
|---|---|---|
| 03/27/2013 | Check #32601 | $5,000.00 |
| 03/27/2013 | Check #32603 | $1,466.84 |
| 03/27/2013 | Check #32603 | $  199.00 |
| 07/09/2013 | Check #32860 | $  366.71 |
| 09/07/2013 | Check #3112 | $  366.71 |
| Total | | $7,399.26 |

169.   Upon information and belief, these payments all relate to the "AP100L Transaction."

170.   Upon information and belief, the AP100L Transaction as established by the written documents was not the transaction that actually occurred.

171.   Upon information and belief, the AP100L Transaction was in fact a loan transaction with Joseph as the lender and the Debtor as the borrower.

172.   The AP100L Transaction was disguised as a sale to enable the Debtor to obtain a new AP100L as inventory for resale (a) without having to pay for the vehicle; and (b) without subjecting the vehicle to the possible security interest of GMCU.

173.   As of February 15, 2013, Joseph had no present intention or financial ability to buy the AP100L and entered into the transaction with the Debtor upon the promise of easy cash. In reality, Joseph borrowed money from BMO and loaned the money to Von Ro on an unsecured basis.

174.   Joseph is an insider of the Debtor for purposes of 11 U.S.C. § 547(b)(4)(B) because the AP100L Transaction was not an arms-length transaction.  Upon information and belief, Joseph did not request any financial information from Von Ro and made no investigation of Von Ro's ability to repay the loan or to resell the AP100L.

175.   The AP100L Transfers were made to a creditor on account of antecedent debt[s] owed to Joseph by the Debtor.

176.   The AP100L Payments were made at a time when the Debtor was insolvent.

177.   The AP100L Payments enabled Joseph to receive more that he would have received if (a) the case was a case under chapter 7 of the Bankruptcy Code; (b) the AP100L Payments had not been made; and (c) Joseph received payment of such debt to the extent provided by the provisions of Title 11 of the United States Code.

178.   By this Count IV, Plaintiff seeks judgment against Joseph: (a) avoiding the AP100L Payments; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; and (c) awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for $7,399.26.

### COUNT V
### (AGAINST JOSEPH)
### FRAUDULENT TRANSFER
*Actual Fraud - 11 U.S.C. §§ 544(b), 550(a), and 551 & Minn. Stat. §§ 513.44(a)(1) et. seq.*

179.   Plaintiff restates the allegations in the preceding paragraphs.

180.   As an alternative to the preference count, Count IV, should the court determine that the AP100L Title Transfer was not in payment of an antecedent debt owed by the Debtor to Joseph or the transfer is not otherwise avoidable as a preference, Plaintiff asserts that the AP100L Title Transfer is nonetheless avoidable as a fraudulent transfer.

181.   At all times material hereto, there was and is at least one creditor who held and who holds unsecured claims against the Debtor that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).  By way of example, and not by way of limitation, such creditors are GE Commercial Distribution Finance and Spire Credit Union fka Greater Minnesota Credit Union and other creditors listed on Schedule F as undisputed obligations of the Debtor.

182.   Plaintiff may avoid the AP100L Title Transfer because the transfer is avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

183.   The AP100L Title Transfer was made by the Debtor with actual intent to hinder, delay or defraud one or more creditors, which creditors' claims arose before or after the AP100L Title Transfer was made.

184.   The AP100L Title Transfer was also made without adequate consideration because while Joseph purportedly agreed to buy the AP100L from Von Ro for $52,159.59, Joseph actually "paid" Von Ro only $44,159.59, the proceeds of the BMO Loan.  But Joseph also received refunds of the purported purchase price totaling $7,399.26 reducing the value given by Joseph to $36,760.33 which was less than the cost of the AP100L Von Ro paid to the manufacturer -- $44,158.40.

185.   The transfer of title to the AP100L was made to hinder, delay or defraud GMCU. By representing to GMCU that the vehicle was consigned to Von Ro by a third-party owner, Hardy believed he could trick GMCU into believing that the AP100L was not inventory owned by Von Ro and therefore not subject to GMCU's claimed blanket security interest in inventory. Joseph willingly participated in and profited from such deception.

186.   Joseph is the initial transferee of the title to the AP100L, the person for whose benefit the AP100L Payments were made, or is the immediate or mediate transferee of the initial transferee.

187.   As collateral for Joseph's loan from BMO, Joseph pledged the AP100L that had been fraudulently transferred to Joseph as collateral.

188.   By this Count V, Plaintiff seeks judgment against Joseph: (a) avoiding the transfer of title to the AP100L; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; and (c) because the value of the AP100L has been dissipated by Joseph in encumbering the vehicle, awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for the value of the vehicle -- $52,049.59.

**COUNT VI**
**(AGAINST JOSEPH)**
**FRAUDULENT TRANSFER**
*Actual Fraud - 11 U.S.C. §§ 544(b), 550(a), and 551 & Minn. Stat. §§ 513.44(a)(1) et. seq.*

189.   Plaintiff restates the allegations in the preceding paragraphs.

190.   At all times material hereto, there was and is at least one creditor who held and who holds unsecured claims against the Debtor that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).  By way of example, and not by way of limitation, such creditors are GE Commercial Distribution Finance and Spire Credit Union fka Greater Minnesota Credit Union and other creditors listed on Schedule F as undisputed obligations of the Debtor.

191.   Plaintiff may avoid the AP100L Payments because the AP100L Payments are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

192.   The AP100L Payments were made by the Debtor with actual intent to hinder, delay or defraud one or more creditors, which creditors' claims arose before or after the AP100L Payments were made.

193.   The AP100L Payments were made without consideration because Von Ro had no legal obligation to make such payments.

194.   Specifically, upon information and belief, the AP100L Payments were promised and made to induce Joseph to participate in a transaction designed to avoid the attachment of security interests of GMCU to the AP100L by making it appear that the AP100L was owned by Joseph and consigned to the Debtor for resale.

195.   In addition, upon information and belief, the AP100L Payments were made by the Debtor in consort with Joseph, with the intent to defraud Stearns Bank by making it appear that

Joseph was the owner of the AP100L, had placed a substantial down payment, and was able to make the payments when in fact he had made no down payment, had provided an incomplete and materially misleading personal financial statement to Stearns Bank, and admittedly was not able to make the payments.

196.  Joseph is the initial transferee of the AP100L Payments, the person for whose benefit the AP100L Payments were made, or is the immediate or mediate transferee of the initial transferee.

197.  By this Count VI, Plaintiff seeks judgment against Joseph: (a) avoiding the AP100L Payments; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; (c) awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for $7,399.26.

**COUNT VII**
**(AGAINST JOSEPH)**
**FRAUDULENT TRANSFER**
*CONSTRUCTIVE - 11 U.S.C. §§ 544(b), 550(a), and 551 & Minn. Stat. §§ 513.41 et. seq.*

198.  Plaintiff restates the allegations in the preceding paragraphs.

199.  At all times material hereto, there was and is at least one creditor who held and who holds unsecured claims against the Debtor that were and are allowable under Bankruptcy Code § 502 or that were and are not allowable only under Bankruptcy Code § 502(e).  By way of example, and not by way of limitation, such creditors are GE Commercial Distribution Finance and Spire Credit Union fka Greater Minnesota Credit Union and other creditors listed on Schedule F as undisputed obligations of the Debtor.  Pursuant to 11 U.S.C. § 544 (b)(1), Plaintiff may avoid the AP100L Title Transfer because the transfer is avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

200.   At all times material hereto, the Debtor was engaged in a business or transaction, or was about to engage in a business or transaction, for which the property remaining with the Debtor after the AP100L Title Transfer was effectuated constituted unreasonably small capital in relation to the business or transaction.

201.   The Debtor received less than reasonably equivalent value in exchange for the AP100L Title Transfer.

202.   Joseph is the initial transferee of the AP100L Title Transfer, the person for whose benefit the AP100L Title Transfer was made, or an immediate or mediate transferee of the initial transferee.

203.   By this Count VII, Plaintiff seeks judgment against Joseph: (a) avoiding the transfer of title to the AP100L; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; and (c) because the value of the AP100L has been dissipated by Joseph in encumbering the vehicle, awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for the value of the vehicle -- $52,049.59.

**COUNT VIII**
**(AGAINST JOSEPH)**
**FRAUDULENT TRANSFER**
*Actual Fraud – 11 U.S.C. §§ 548(a)(1)(A), 550(a), and 551*

204.   Plaintiff restates the allegations in the preceding paragraphs.

205.   The AP100L Title Transfer and the AP100L Payments were made on or within two years before the Petition Date.

206.   The AP100L Title Transfer and the AP100L Payments to Joseph are transfers that were made or obligations that were incurred by the Debtor with actual intent to hinder, delay or defraud one or more creditors to which the Debtor was, or to which the Debtor became, indebted on or after the date of the transfers.

207.   To the extent that Joseph is not the initial transferee, he is an immediate or mediate transferee of the initial transferee, or the person for whose benefit the transfers were made.

208.   Upon information and belief, Joseph cannot satisfy his burden that he took the AP100L Title Transfer and the AP100L Payments for value and in good faith and without knowledge of the voidability of the transfers.

209.   By this Count VIII, Plaintiff seeks judgment against Joseph: (a) avoiding the AP100L Title Transfer and the AP100L Payments; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; and (c) because the value of the AP100L has been dissipated by Joseph in encumbering the vehicle, awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for the value of the vehicle -- $52,049.59 and for the AP100L Payments totaling $7,399.26.

**COUNT IX**
**(AGAINST JOSEPH)**
**FRAUDULENT TRANSFER**
*Constructive Fraud – 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 551*

210.   Plaintiff restates the allegations in the preceding paragraphs.

211.   At all times material hereto, the Debtor: (a) was insolvent on the dates the AP100L Title Transfer and the AP100L Payments were made or became insolvent as a result of the transfers; and/or (b) was engaged in businesses or transactions, or was about to engage in businesses or transactions, for which the property remaining with the Debtor constituted unreasonably small capital; and/or (c) at the time of the transfers, intended to incur, or believed that the Debtor would incur, debts that would be beyond its ability to pay as the debts matured.

212.   The Debtor received less than reasonably equivalent value in exchange for the AP100L Title Transfer and the AP100L Payments.

213.   To the extent that Joseph is not the initial transferee, he is an immediate or mediate transferee of the initial transferee, or the person for whose benefit the transfers were made.

214.   Upon information and belief, Joseph cannot satisfy his burden that he took the AP100L Title Transfer and the AP100L Payments for value and in good faith and without knowledge of the voidability of the transfers.

215.   By this Count IX, Plaintiff seeks judgment against Joseph: (a) avoiding the AP100L Title Transfer and the AP100L Payments; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; and (c) because the value of the AP100L has been dissipated by Joseph in encumbering the vehicle, awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for the value of the vehicle -- $52,049.59 and for the AP100L Payments totaling $7,399.26.

## COUNT X
### (AGAINST, HARDY, JOSEPH, TRACY, AND
### JOHN DOE 1-X, JANE DOE 1-X, ABC CORPORATION)
### AVOIDANCE OF UNAUTHORIZED POST-PETITION TRANSFERS
*11 U.S.C. §§ 549, 550, 551*

216.   Plaintiff restates the allegations in the preceding paragraphs.

217.   Upon information and belief, on the Petition Date, Stearns Bank was in possession of the original of the Enterra Title by the State of Illinois.

218.   Upon information and belief, subsequent to the Petition Date, Stearns Bank delivered the original Enterra Title to Hardy or Joseph or Tracy or some unknown person or entity.

219.   The Enterra Title was property of the bankruptcy estate on the Petition Date.

220.   The transfer of the Enterra Title by Stearns Bank was not authorized under Title 11 of the United States Code or by the court.

221.   Hardy, Joseph, Tracy or some other unknown transferee are immediate or mediate transferees of the initial transferee of the Enterra Title or are the individuals/entities for whose benefit such transfers were made.

222.   Upon information and belief, Hardy, Joseph, Tracy or some other unknown transferee cannot satisfy their burden that they took the Enterra Title for value and in good faith and without knowledge of the voidability of the transfer of the Enterra Title Post-Petition Transfers or are the individuals/entities for whose benefit such transfers were made.

223.   In the Stearns Bank Settlement, Stearns Bank has agreed to stipulate to the entry of judgment on the claims against it in this Count X.

224.   By this Count X, Plaintiff seeks judgment against, Hardy, Joseph, Tracy or some other unknown transferee:  (a) avoiding the transfer of the Enterra Title; (b) preserving the avoided transfer for the benefit of the estate under Bankruptcy Code §551; and (c) awarding Plaintiff possession of the Enterra Title.

## COUNT XI
### (AGAINST DEFENDANT GMCU)
### SURCHARGE
### *11 U.S.C. § 506(c)*

225.   Plaintiff restates the allegations in the preceding paragraphs.

226.   Plaintiff has incurred necessary costs and expenses in pursuing, and, if successful in this litigation, in recovering, preserving and disposing of property of the estate.

227.   Should GMCU assert and the court determine that GMCU has an allowed claim which is secured by a valid, perfected and unavoidable security or other interest in property as of the Petition Date which is senior to the interest of Plaintiff, then Plaintiff may recover all

such reasonable and necessary costs, including, without limitation, attorneys' fees and costs from any property securing GMCU's allowed claim.

228.   By this Count XI, Plaintiff seeks to surcharge any collateral of GMCU as provided in this Count XI.

## COUNT XII
## (AGAINST DEFENDANT SMITH SOLELY IN HIS OFFICIAL CAPACITY AS SHERIFF OF KANABEC COUNTY, MINNESOTA) TURNOVER AND ACCOUNTING 11 U.S.C. § 543(b)

229.   Plaintiff restates the allegations in the preceding paragraphs.

230.   Pursuant to a levy, Smith came into possession of property of the Debtor, including the Three Remaining Vehicles.

231.   Smith remains in possession of the Three Remaining Vehicles.

232.   Smith is a custodian of the Three Remaining Vehicles within the meaning of 11 U.S.C. §§ 543(a) and 101(11) and is therefore required by 11 U.S.C. § 543(a) to deliver the Three Remaining vehicles to Plaintiff.

233.   Smith is also required to account for all property of the Debtor which came into his possession pursuant to the levy.

234.   By this Count XII, Plaintiff seeks an order requiring Smith to turn over the Three Remaining Vehicles to Plaintiff and to provide Plaintiff with an accounting of all property of the Debtor levied by Smith.

WHEREFORE, Plaintiff prays for judgment as follows:

1.   On Count I:  for a determination: (i) that the AP100L and the Enterra were on the Petition Date, or will become upon avoidance of claimed liens and interests, property of the estate free and clear of all liens and interests except the interest of BMO in the AP100L; and (ii)

34

that Stearns Bank and GMCU had no validly perfected security interests in any property of the debtor on the Petition Date.

2.      On Count II:  for judgment against Hardy, Joseph, Tracy and GMCU avoiding the grants of all security interests by the Debtor to Stearns Bank or GMCU and preserving such security interests for the benefit of the estate.

3.      On Count III:  for judgment against Joseph: (a) avoiding the AP100L Title Transfer to Joseph as a preference; (b) preserving the avoided transfer for the benefit of the estate under Bankruptcy Code §551; and (c) awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for the value of the AP100L, which according to the purported purchase agreement was $52,049.59.

4.      On Count IV:  for judgment against Joseph: (a) avoiding the AP100L Payments; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; and (c) awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for $7,399.26.

5.      On Count V:  for judgment against Joseph: (a) avoiding the AP100L Title Transfer; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; and (c) because the value of the AP100L has been dissipated by Joseph in encumbering the vehicle, awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for the value of the vehicle -- $52,049.59.

6.      On Count VI:  for judgment against Joseph: (a) avoiding the AP100L Payments; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; and (c) awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for $7,399.26.

7.     On Count VII:  for judgment against Joseph: (a) avoiding the transfer of title to the AP100L; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; and (c) because the value of the AP100L has been dissipated by Joseph in encumbering the vehicle, awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for the value of the vehicle -- $52,049.59.

8.     On Count VIII:  for judgment against Joseph: (a) avoiding the AP100L Title Transfer and the AP100L Payments; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; and (c) because the value of the AP100L has been dissipated by Joseph in encumbering the vehicle, awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for the value of the vehicle -- $52,049.59 and for the AP100L Payments totaling $7,399.26.

9.     On Count IX:  for judgment against Joseph: (a) avoiding the AP100L Title Transfer and the AP100L Payments; (b) preserving the avoided transfers for the benefit of the estate under Bankruptcy Code §551; and (c) because the value of the AP100L has been dissipated by Joseph in encumbering the vehicle, awarding Plaintiff a money judgment against Joseph pursuant to Bankruptcy Code § 550(a) for the value of the vehicle -- $52,049.59 and for the AP100L Payments totaling $7,399.26.

10.     On Count X:  for judgment against Hardy, Joseph, Tracy or some other unknown transferee:  (a) avoiding the transfer of the Enterra Title; (b) preserving the avoided transfer for the benefit of the estate under Bankruptcy Code §551; and (c) awarding Plaintiff possession of the Enterra Title.

11.     On Count XI:  to surcharge any collateral of GMCU under 11 U.S.C. §506(c) for Plaintiff's reasonable and necessary costs, including without limitation attorneys' fees and costs incurred by Plaintiff.

12.     On Count XII:  for an order requiring Smith to turn over the Three Remaining Vehicles to Plaintiff and to provide an accounting of all property of the Debtor seized by Smith pursuant to a sheriff's levy.

13.     For pre and post-judgment interest and such other and further relief as the court may deem just and equitable.

14.     Plaintiff acknowledges that he has asserted liability against Joseph under several legal theories.  Plaintiff acknowledges however that regardless of which legal theory or theories prevail, he is entitled to only recovery against Joseph for the amount of $52,049.59 + $7,399.26 = $59,448.85.


Dated:  September 1, 2015                    LAPP, LIBRA, THOMSON, STOEBNER &
                                            PUSCH, CHARTERED


                                            By:  _/e/ Ralph V. Mitchell_____
                                                 John R. Stoebner (#140879)
                                                 Ralph V. Mitchell (#184639)
                                            120 South Sixth Street, Suite 2500
                                            Minneapolis, MN 55402
                                            T (612) 338-5815
                                            F (612) 338-6651
                                            JStoebner@lapplibra.com
                                            RMitchell@lapplibra.com

                                            **Attorneys for John R. Stoebner,
                                            Successor Trustee of the Bankruptcy Estate
                                            of Von Ro Corporation.**